Good morning. Good morning, Council. Welcome to the Ninth Circuit. Before hearing your argument, I want to officially submit two cases. Kennedy v. Broomfield and Environmental Research Center, Inc. v. Hotsa Health Wellness Center, International One. We also have one case that is submission has been deferred, that is United States v. Ghania. The first case for argument is Csutoras v. Paradise High School. I believe that Mr. Handy, you're first, so please proceed. Thank you, Your Honor. Good morning, Your Honors. My name is Russell Handy. I represent the appellant. I want to start by reiterating a key point about the Dear Colleague letters and the resource guide. There's a lot of discussion about it and what role it plays in deciding this case. We're not arguing that any particular best practice outlined by those departments, the Department of Education and the Office of Civil Rights, is mandatory. What we're saying is that the implementing and enforcing agencies' numerous statements that the ADA requires schools to prevent and respond to bullying, both verbal and fiscal, is a valid obstruction of the law, since the regulation itself doesn't necessarily address bullying. If this panel disagrees, if it finds that the school does not have a duty to prevent serious bullying, then we lose, of course. But assuming there is such a duty, these evidence-based best practices, we believe they're examples, they're evidentiary, they're examples of the type of steps that must be taken if, in fact, the school has this duty. The failure to... Mr. Handy, let's just arguendo. Let's assume that there's some possibility that a Dear Colleague letter might have force of law. Which Dear Colleague letter would you point to as evidence that the school, in this case, school district, violated the law by failing to follow something that's required by a Dear Colleague letter? I think it would be the 2013 Dear Attachment. It's the best practices attachment to that Dear Colleague letter. And this, of course, is the Implementing and Enforcing Agency identifying the evidence-based best practices for preventing bullying. And it gives a list. And two of the critical ones in that list, obviously, aside from training school officials, are having sufficient adult supervision circulating through extracurricular activities like this football game. We don't think that... We think that they failed to do that. I mean, there's obviously, after the fact, hindsight logic because a kid was brutally beaten in front of a crowd who were videotaping and egging him on and there was no intervention. So there's a rational jury could find that whatever adult supervision they have there, we know there's only four people there at this huge game, that it was insufficient. So that's the first one. Second one is, of course, practice. Let me ask you about that. Let me ask you about that. So I'm looking at it right here. That's one of the challenges with, I think, trying to use these letters. I'm looking at it. It's one paragraph. I think it's on ER 99. It says provided active adult supervision, which I think, which they did. They did provide adult supervision. As I recall, they had four adults. I think you're saying that a rational jury could find that it wasn't enough. I think your argument is basically that they could find that it wasn't enough because an incident happened. And so what I'm trying to say is that while these letters provide any sort of notice to a regulated entity, a school, that they need to provide X, it seems to me like you're basically just saying if a bad event happens, then that would be evidence that they didn't provide sufficient X. And if that's the case, I think your argument sort of devolves to these letters basically create a strict liability regime or at least a regime where a jury just gets to decide whether or not they've been complied with. But then that's, it's this vague standard of provide enough, you say, adult supervision. But how does that provide? That's not like what you normally see from an agency. An agency's regulations will normally say, you know, you need to do X. And this is something very vague, it seems. How do you get past that point, I guess? Yeah, I agree. Sometimes you have, for instance, like in physical access cases, you have it spelled down out to the smallest inch, right? And then in other cases, it's, these are policy and practice cases. And there's the regulation mandates a certain responsibility for the schools. How they carry that out is left up to them. And as the dear colleague's letter said, there's a lot of approaches you can take. But, and a lot of times it does come down to just that question. It is a triable issue of fact, did you take sufficient steps? Have you complied with your mandate to protect against bullying? What did you do? Did you do enough? And so like, for instance, if they just had one person there, just one person at a gang of 7,000 people, could they say, look, we did it, we provided adult supervision? Let me ask you, counsel, let me, so I, okay, so I think that I understand how you see how these letters work. But let me, let me ask you this, just to make sure I'm clear. If there were no let's assume for a second, there were no letters, would you, would you believe that you could bring this action? Or do you need to have the letters? I think that it would be very difficult to bring this action if there were no letters. Okay. Okay. So that's why, that's why I thought, I thought, remember you saying something akin to that in your reply brief, I think maybe. And so then since you, so then you really are relying on the letter and you're relying on this paragraph that tells schools that they, that, that one of the best practices is to provide adult supervision. But I think what you're saying is that what this letter did by providing this one paragraph is basically made a tribal issue. Because I think if you're saying you couldn't do it without the letters and you're saying this one paragraph created basically a tribal issue that whenever somebody with a disability ends up being harmed and, and you could try to tie it to not having enough adult supervision, they just basically made a jury issue. That's a very, isn't that kind of an odd way for an agency to, to provide sort of regulation, basically saying, I mean, in theory, it would have been more simple under your, to do what you're saying by saying, we're creating this, we're creating basically a, we're saying that a jury can, can, can determine this issue, right? Because that's what you're but that's not what it says. It just says you should provide some adult supervision. Yeah. Let me clarify, judge. When, when I say that I need the letters, I don't need that paragraph though. I wouldn't even need the best practices necessarily. I need the letters to establish that prevention of bullying is in fact within the regulatory framework because the reg, neither the statute nor the regulation mentioned anything about bullying. And so there would be a tough argument to make that part of the school's duty to provide programmatic access and to prevent bullying. Sure. You can make the argument, but it'd be a lot harder without these letters. I think let me, let me make sure I understand what you're saying just now. So you're saying you don't really need this, this thing you were just pointing to the, the attachment. All you're saying is basically the fact that the agency has said, bullying is preventing bullying is, is part of the ADA of the ADA and, and these, these, these statutes now, now means that the agencies, again, are you saying that they have a strict liability? I guess not strict liability. You're just saying that it's up to a jury. It's always up to a jury. Yeah. What I'm saying is that under the programmatic access obligation, both the Rehabilitation Act and the ADA is that going back to 2000, many, many letters have come out for the interpretation saying part of that duty is to make sure that in, in, in such a way that they can't continue their, their, their free and public education, right. Which is one of the programs. I said, that's essential. Now the best practices is kind of evidentially like that. Here's this, the, these, these authorities, right. This is the authority on the stuff they're saying, look, here's some of the things you can do. None of them carry the force of law. They're not indispensable. They're not, there's no strict liability, but these are some of the things that you can do. What we find to evidence-based best practices. And we're saying that they didn't do those things. They didn't track. One of the things is tracking bullying incidents. And so they got a more comprehensive program. They don't track anything. Let me just ask you a slight variant of what my colleagues inquiring about what's the nexus between the bullying incidents and the plaintiff's disability. In this case, these letters are very general and they don't seem to focus at all on the disability aspect of this. It just got to try to prevent bullying. What's the nexus between bullying incidents and the plaintiff's disability and was Paradise School aware of that nexus? So I don't think there's any evidence or very little evidence that, that Justin, the perpetrator here, assaulted and bullied Cyrus because of his disability. I don't think that's a motivating influence here. And that's, that's another reason why we have to talk about how much deference is given to these letters, right? Because the, one of the statements in the 2014 letter is, I'll quote it, whether or not the bullying is related to the student's disability, any bullying of a student with a disability that results in the student not receiving their meaningful educational benefit constitutes a denial of that program. And so basically, it seems to me you're detaching the disability aspect of this act, which is the course, the main function of the act from the act of bullying. It could be anybody. It could be somebody who had no disability at all under your reading. Is it not correct? Yeah, it's weird because one of the courts said that we're just converting this to an anti-bullying statute. And that's a concern. And I think the response here is that it's true. The school has a duty to protect against assault for everyone. We know that. But for students with disabilities who are already at a disadvantage, they happen to have a Title II additional right to be free from tort violence at school. They don't just have the normal negligence claims. They have something else. It's akin to the eggshell plaintiff rule. When a school fails to take serious and reasonable steps to prevent peer-to-peer bullying, and it turns out the victim happens to be a student with a disability and entitled to additional rights, they can state a claim under Title II that other people couldn't. And so, and that works in a lot of ways. Like people under the ADA, people have preferential rights all the time. I don't have a right to park closest to the entrance, but the ADA gives people with disability that right. There are certain rights that arise under the ADA scheme that other folks don't have. But if you- So, counsel, can I, so I'm following you on that. Can I flesh out a little bit? So are you normally, I mean, if the school had noticed, you know, let's say if somebody is getting bullied or like there's bullying going on in the hallway all the time. And if you had a case like that, I don't think you would think you even needed these if they turned a blind eye to it or something like that. But as I understand it, I think you're kind of using the letters to replace that, right? Like you're saying, since we have these letters, we don't have to have that notice. But what, but you keep saying if the school took reasonable actions, is it whether or not the school took reasonable actions, doesn't that sort of still relate it to whether or not what the school knew or should have known was going on? Yeah. But I think the distinction here is that our case relies on the fact that they didn't take sufficient actions, safeguards to protect in the first instance against bullying. There would be a separate claim if they didn't respond appropriately to bullying. That's a big part of these letters. But one of them is, and they say over and over, to prevent bullying. And that's why they have these best evidence-based best practices. A lot of them are prophylactic, right? They're only taking one incident. So how many people, how many adults would they need to have at that football game? You see, from my perspective, it's really hard. You're saying they need to prevent it. They need to have done more, which I guess now we know, right? Hindsight, like you said earlier. But how many adults would have done that? I don't know the answer to that question. And perhaps it's a tribal issue, because I don't think anyone can point to anything and say, this is de facto, the ratio, you know, like they have a nursing home, one healthcare provider for every eight. It's not gonna be something like that. There's no actual appendix that you can cite to. But four per 8,000 students and a lot going on. I think that a rational jury can find that's not simple. So it sounds like what you're saying is it really doesn't matter that your client had a disability here. The school had an obligation to prevent bullying under the Dear Colleague letters by having more adults there. You also seem to concede that the school district was simply not aware of the problem. So they don't have any deliberate indifference issue. Is that correct? So what I do believe is the school had a duty to protect against bullying, regardless of knowing where the students are located that are disabled. That's true. Okay, but again, that's more just on a basically common law tort kind of an issue. It's not based upon a disability in this case, is it? Well, it's just that the only person who can bring a claim under the addition, aside from tort negligence, the only person only people can bring a claim under Title II and rehabilitation are in fact students with disabilities, who as the Department of Education says, are much more vulnerable in these situations, specifically people with ADD and their particular courts to be bullied. And so this is the framework that the DOE has laid out saying that they have a duty to protect against this. Obviously, they should do it for everyone. In fact, they say that in the letters, but persons with disabilities have an additional entitlement, a certain civil right that comes to not being bullied in there because they're in a vulnerable state, they're more likely to be bullied because of a lot of their characteristics. And so the school has this duty to protect against bullying going on or assaults in this case, which is a form of bullying. You want to save any of your time, you're almost done with your time, but it's up to you. Yeah, can I save my last 45 seconds, please? Okay, very good. All right, Mr. Ayers, you represent the school district. Let's hear from you. Thank you. Again, William Ayers and I do represent the defendants, the appellees. I think I would probably start with asking if there are any questions from the panel that I can go directly to before I begin my prepared remarks. Let me ask you this. In your brief, you did not cite our, did you weigh the argument that the Dear Colleague letters are not legally binding interpretations of regulations? Not at all, your honor. In that regard, we would point out that all of the cases, all of the cases cited by appellant, none of them involved the Dear Colleague letters involved herein. None of them involve those letters. In our view, our deference and Chevron deference are not applicable to the Dear Colleague letters involved in this case. And more particularly, they're not entitled to deference on these best practices. And with regard to that, we would point out several things, your honor. We would point to the October 21, 2014 letter. It begins by talking about the letter being a guidance letter in a long history of guidance. It talks about building on the guidance from prior Dear Colleague letters and clearly references the 2013 Dear Colleague letter. And we believe the August 20, 2013 Dear Colleague letter is at the heart of what the appellant is trying to do. And with regard to that letter, we would make the following observations. On the first page of that Dear Colleague letter, it says attached to this letter are specific strategies that school districts and implement to effectively prevent the key words there being a can implement. It doesn't say must implement and they're referring to the enclosure to that Dear Colleague letter. The last page before we get to the enclosure on that Dear Colleague letter specifically includes the language. We also encourage states and school districts to reevaluate their policies and we also encourage, that's not mandatory language, that's not talking about something being required, that's an encouragement. The enclosure itself, I'm sorry, the enclosure itself, the very first sentence in that enclosure says there is no one size fits all or simple solution for addressing. Counsel, what about, it seems like you're, the plaintiff in this case, their argument is not that they're, their argument is that this language basically just notifies the school that they need to be doing more to prevent bullying and sort of creates a a regime where now somebody can bring a lawsuit if somebody's bullied. And I think, I think they say if they're bullied, A, and if they're, if they have a disability, I think, if they're bullied and they have a disability, somebody can bring a lawsuit and then it's just up to a jury. So I think they, they're acknowledging that these aren't particularly, you know, these aren't really concrete rules, so to speak, right? But they're just saying that what the, I think what they're just saying is that generally speaking, what this letter does is it kind of creates a, it puts the school on notice that now you, now this can be brought in front of a jury and the jury can decide whether or not you are doing enough of the kind of stuff that they're telling you that you should be doing. I think that's their theory. What, what is your response to that theory? The first response is very similar to your earlier questions concerning, doesn't this create some type of strict liability scenario? Yeah, but I think, I mean, I call it strict liability. That's probably not totally accurate because they would say, no, strict liability, you know, jury, you're automatically sort of you just will get to go to a jury. It creates a fact question for a jury every time. I guess I think it's their position. Maybe I misspoke. I'm sorry. Thank you. You know, I've heard arguments that we should have done something. We had a duty to protect this, this young man that had a disability and we don't disagree with that. The school had a duty to protect this young man. But now let's focus on the facts, the undisputed facts of this case. It is undisputed that the attack on Cyrus was sudden and unexpected. I believe that there's been a videotape that was submitted to the record showing it. This incident. Counsel, let me, let me try to bring you back to my, if, if you know what I described earlier, not strict liability, but strictly, you know, we'll go to a jury. If that's what, if that's what these letters were trying to do, I guess I have two questions that are kind of related. Do you think that the agency has the ability to do that? I mean, I'll put aside for a second, whether that's what they were trying to do with these letters, but let's say the agency had just written a letter and said, this is what we're doing. We are basically saying that we're going to give you some practices. And if somebody gets bullied, who has a disability, it's, you know, we are creating essentially a cause of action that will allow it to go to the jury so that the, so that a jury can, can an agency do that? It's the first question. And then whether or not you think an agency could do that, why or why not, is that what these letters are doing? First, we don't believe an agency can do that. We believe this is a matter of law. This is something that the courts have to decide. In this case, the notion that these Dear Colleague letters create a tribal issue of fact concerning a cause of action under the ADA or Section 504, we agree that if these Dear Colleague letters are allowed into evidence and they carry some type of deference, either Chevron or our deference, then there might be a tribal issue of fact as to whether or not there is a valid claim under the Section 504 or the ADA. But that would be a claim for injunctive relief. When you talk about a lawsuit for money damages, you have the added layer of deliberate indifference. It requires some type of mens rea, which requires some type of notice, not constructive notice established by some guidelines that are aspirational, guidelines that are best practices. It requires actual notice. The undisputed facts in this case show that was not present in this case. I wanted to follow up on that a little bit because I'm curious about what the school knew about this student. The school knew that he had a disability. Is that correct? The school knew that he had ADD, a disability. They knew that was a disability. The school did not know with respect to this student that he had not been notified that he was especially likely to be bullied on account of that disability. Is that correct? That is correct. The undisputed evidence shows that over and over. The there's no evidence that the school district was asked for an accommodation. What would your position be if the parents had asked for an accommodation because he was subject to being bullied on account of his disability? Our position would be entirely different. Okay. So your position is then that the letters from the federal government saying that students with disabilities are under special risk of being bullied, that that would not be sufficient to give them notice that this student is subject to being bullied. Is that kind of the knife edge that we're at? It is. So let me ask you this. If, and this is just hypothetical, if Paradise had a policy of deliberate indifference toward stopping bullying of disabled students as a general rule, could we apply our Title IX cases and hold that the plaintiff's case here should proceed past summary judgment? Frankly, your honor, I don't know the answer to that question. I didn't research in preparation for today and I apologize. I'd be happy to submit it. Perhaps it's just academic because I gather that the plaintiffs here haven't even admitted that the school district knew nothing about this. So there couldn't have been deliberate indifference, but this is a matter of law. You're not sure basically, right? That's true. Okay. With respect to me, counsel, can I ask, so do you think, do you think the agency could have, I don't, I'm not asking if they did that, but could they have, you know, let's, let's use the example of the adult supervision. If the agency had said, rather than that one sort of paragraph that just says you should have some adult supervision, but it said you should have adult supervision to prevent bullying of students with disabilities. And, and you should have one parent or one adult per X number of kids. So given a more concrete, could they, could they do that? And would that, would that be binding? Would that In terms of the facts in this case, I want to go back to what happened. It was sudden unexpected, and it was over within a matter of seconds. What type of supervision would have been required to protect Cyrus from this attack? It would have to be, it would have to be eyes on with an adult supervisor watching this teenage boy at the football game. That would, in our opinion, that would violate his rights. That would be discrimination because you have ADD. We're going to assign to you supervision sufficient to protect against a sudden and unexpected attack. It was over within a matter of seconds. That would be an adult supervision on the, on the teenage boy throughout the entire football game. Well, no, I, so I understand that. I, it does seem like it would have been very difficult to keep this from happening. I, it seems to me like the plaintiff in this case, they kind of acknowledge that and they've sort of incorporated that in a sense that there's, again, I don't want to call it strict liability, but they're basically saying that if, if one of these things happens, that's why it just goes to a jury to figure out whether you, you had enough. But I, what I'm saying, what I'm saying is let's say they just, let's say they had issued guidance that made it clear that for that size activity, you should have had 10 that you had, you should have had 10 adults instead of the four that you had. Right. Would that, and then, and then you had, let's say you had 10 or 11 there, then presumably you could say, you know, yeah, we still didn't keep it from happening, but we, we complied with the, with the more concrete guidance. I think, I think what the plaintiff would say here was that if they said you needed to have 10 and you only had six, right? Then even if, even if 10 wouldn't have stopped it from happening, that you, that it would, you should go to a jury. I think that's their position. I guess what I'm asking you is, do you think that the agency could do that? Could they, could they do, I know you disagree with what the plaintiff's theory is here, but I'm trying to figure out how much of that is what you think the agency doesn't have the ability to do versus what you think that they think that these letters just aren't doing that. Right. You see what I'm saying? Like, could they have, could they have actually set out concrete rule, essentially rules in a letter and said, if you don't follow these rules, then there, then you, you, you can be liable in a private cause of action. So there are a couple of parts to that. And first would be, do the letters deserve a Chevron deference? Do the letters, are they entitled to our deference? And does the agency have the authority to propagate rules like that? In this context, the only rule that would have protected this young man from this attack would be the type of supervision I just mentioned. There's nothing else that would have protected him. And I believe, we believe that that flies directly in the face of the regulations that say that you're not supposed to do something like that. This young man is supposed to be given as much as close to the same treatment as everybody else. Can you imagine a teenage boy at a football game, having an adult watching over his every activity? If we did that, that would constitute discrimination. That would constitute some kind of action. I don't know if I answered your question. I gave it my best. Well, let me just see if I can sum up my understanding. I gather that the school district's position is that this is really not anything would ever get to the jury because you have to have a duty, a legal obligation to do something that was not done. In this case, the plaintiff points to the dear colleague letters. You say they're not binding or not, have mandatory language in there. You don't even get to our or Chevron deference because the act doesn't specifically require it. And in this case, there was no, indeed, the plaintiffs admit in their pleadings that there was no deliberate indifference. So bottom line is, although the school district feels sorry for this young man, there is no legal liability or any basis for going to the jury. Is that a fair summary? Pretty close. Thank you, Your Honor. What have I left out? What have you left out? You said it was pretty close. So I'm saying what aspect of your defense have I missed? I think Judge Smith wants to hear that it was a perfect summary of your case. I don't care whether it's perfect. I just want to make sure I understand. Well, my remarks are five pages long, and in terms of your summary, I thought it was pretty darn close to capsulizing what the ideas we have in mind. I've got a whole bunch of detail here, and I've got 14 seconds. I sincerely appreciate the opportunity. Our pleasure. Do either of my colleagues have additional questions for Mr. Ayers? Very well. So Mr. Handy, you have a little bit less than a minute, but if you want to give us a real zinger, we'll look forward to getting it here. Yes, Your Honor. I just have two quick points I'd like to make. First, it's interesting this commentary about, you know, you'd have to literally be watching him the entire time to have prevented this. It's a little bit sophisticated to make that argument, because the more presence you have there, it acts as a preventative. Like, kids don't think they can get away with something if they're constantly seeing the adults and the security officers floating around. It's the absence of any notable school presence or security that allows people to feel like, I can get away with this. And so you don't have to be watching over the kid every moment, but just having more adults, as they say in the letter, circulating through and making sure everyone knows the adults are here, you can't get away with certain things. That in and of itself is... Counselor, that's the difficulty here. In my hypothetical, where they actually told you a ratio, and if the school had complied with that, then you could say, they said we should have more adults, you didn't. But the problem is, it doesn't say how many adults you should have. So, I mean, it's always going to be, they could have had 20 adults there, and if this had happened, you'd be making the same argument, right? I don't understand. Not necessarily. We're making the argument because there's only four. If they had loaded with adults, we wouldn't be making this argument. It just wouldn't make sense. And so I think that our position has rationality to it, we think that's something that a rational jury could find. But I don't... I think we've beaten this issue. I do want to make one more... Your time is up. Let me ask whether either of my colleagues has additional questions for Mr. Handy. We know that both of you would like to say more, and you would do it brilliantly, but your time is up. So we thank both counsel for your argument. The case just argued of Centaurus versus Paradise High School is submitted. Thank you, your honors. Appreciate it.
judges: Schroeder, M. Smith, Vandyke